**Opinion issued August 7, 2014**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-12-01128-CR**
**NO. 01-12-01129-CR**

———————————

**LAWRENCE REED, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 56th District Court**
**Galveston County, Texas**
**Trial Court Case Nos. 12CR0429 and 12CR0727**

---

**MEMORANDUM OPINION**

A jury found appellant, Lawrence Reed, guilty of the offenses of deadly conduct[1] and unlawful possession of a firearm by a felon,[2] and it assessed his

---

[1]    *See* TEX. PENAL CODE ANN. § 22.05 (Vernon 2011); appellate cause number 01-12-01128-CR; trial court cause number 12CR0429.

punishment at confinement for ten years for each offense, with the sentences to run concurrently. In four issues, appellant contends that the evidence is legally insufficient to support his convictions and the trial court erred in admitting certain evidence and not compelling the State to test forensic evidence.

We affirm.

## Background

The complainant, Herneilius Preston, testified that on February 3, 2012, appellant came to his automobile repair shop in La Marque, Texas. After the complainant saw appellant fighting with his friend, Markus Frank, he stepped in between the men to stop the fight, picked up appellant, took him to his car, a green Cadillac, and told him that he needed to leave the shop. Appellant then told the complainant that he was "wrong" and he would be back. Frank also left the shop, but a few minutes later, telephoned to warn the complainant that he believed appellant was on his way back to the shop.

The complainant was still speaking with Frank on the telephone when appellant came back to the shop as a passenger in the same green Cadillac in which he had left. Appellant, while in the passenger seat of the car, asked the complainant, "Where [Frank] at?" Although the complainant told appellant that he had made Frank leave, appellant insisted that Frank was still at the shop.

---

[2] *See* TEX. PENAL CODE ANN. § 46.04 (Vernon 2011); appellate cause number 01-12-01129-CR; trial court cause number 12CR0727.

2

Appellant then pulled out a handgun, and the complainant asked if he was "going to shoot [his] shop up." The complainant noted that appellant, still in the passenger seat of the green Cadillac, held the gun in his right hand, with his arm hanging out of the car window. The complainant asked again if appellant was going to "shoot [up his] shop while [his] little boy" was there, and appellant replied, "Fuck you and your little boy." Appellant then fired four to five shots, and the complainant dropped to the ground to avoid being hit.

The complainant identified for the jury photographs showing bullet holes in his shop's door, a customer's car, and the side of his building. He also identified and described the contents of a surveillance-camera videotape recording showing appellant's green Cadillac driving by and stopping momentarily at the shop, appellant talking to the complainant and then shooting his gun, and the green Cadillac driving away.

The complainant also explained that in a subsequent conversation with appellant, appellant apologized to him for the shooting and said "Man, it wasn't supposed to go down like that." The complainant later received a telephone call from another man, whom appellant had asked to make the call. The complainant could hear appellant in the background telling the other man what to say to him. During the call, appellant instructed the other man to ask the complainant not to

testify against him, and he offered the complainant money in exchange for not testifying.

Markus Frank testified that he has known appellant, who drives a green Cadillac, since childhood. Frank explained that he has been a friend of the complainant and sometimes works in his automobile repair shop. On February 3, 2012, Frank was at the shop "hanging out" with the complainant and Emil Thorne when appellant drove up. Frank and appellant then had a "little fistfight" about a girl. After the complainant broke up the fight and put appellant into the green Cadillac, Frank and Thorne left the shop in Thorne's car. At a nearby stop sign, Frank saw Decoreyon Thomas driving appellant's green Cadillac, with appellant seated in the passenger seat, and turning back toward the shop. Frank then telephoned the complainant to tell him that Thomas and appellant might be headed to his shop. While he was still speaking with the complainant on the telephone, Frank overheard the complainant talking very loudly and then two to three gunshots. After hearing the gunshots, Frank and Thorne went back to the complainant's shop, where Frank saw bullet holes in the outside of the complainant's building and in the back taillight of a customer's car.

Emil Thorne testified that he has been a friend of Frank's since they were in high school and had known appellant, who drives a green Cadillac, for about a year. Thorne explained that he and the complainant are business partners, with

4

Thorne running a haircutting business in the complainant's shop. On the afternoon of February 3, 2012, Thorne was outside the shop when appellant pulled up in his car. Thorne saw Frank and appellant's fistfight and the complainant putting appellant back into his car. About ten minutes after appellant had left the shop, Thorne and Frank left to drive to Frank's home. As they were driving, Thorne saw appellant's car heading in the direction of the complainant's shop, but he could not see who was driving. Frank then telephoned the complainant, and while they were talking, Thorne heard the complainant say "He shooting." Thorne turned his car around and drove back to the complainant's shop, where he saw bullet holes in the complainant's building, the shop's door, and a customer's car.

La Marque Police Department ("LMPD") Sergeant R. Garcia testified that on February 3, 2012, he was dispatched to investigate the shooting at the complainant's shop. When he arrived and learned that no one had been injured, he located witnesses and secured the crime scene. Garcia later found the green Cadillac that witnesses had described to him at Thomas' residence.

LMPD Detective Sergeant S. Spruill testified that after he learned of the shooting at the complainant's shop, he went to the crime scene. He was subsequently informed that officers had located the green Cadillac involved in the shooting and had detained Thomas. Spruill then went to the location of the green Cadillac. After the car was towed to an impound lot, he obtained warrants to

5

search the green Cadillac and to obtain DNA samples from appellant and Thomas. Spruill noted that he and other LMPD officers later checked the entire area around the complainant's shop for bullet holes, and they found multiple bullet holes in the door to the shop and the complainant's building.

LMPD crime scene investigator ("CSI") B. Auzston testified that on February 3, 2012, he was dispatched to the shooting at the complainant's shop. He used a "grid pattern" to look for evidence, and he took photographs at the crime scene. Auzston also obtained and reviewed a surveillance-camera videotape recording of the shooting and he recovered from a Pontiac Grand Prix, owned by a customer of the complainant, two "rounds," or spent bullets, from a handgun. One of the bullets went through the taillight of the Pontiac and the other was located under the car.

After he photographed the crime scene, officers notified CSI Auzston that the green Cadillac involved in the shooting had been located. He then met Sergeant Spruill at the location of the green Cadillac, and he took photographs of it. The officers had the green Cadillac towed to an impound lot, and they later obtained a warrant to search it for shell casings and other evidence and swab it for DNA evidence and gunshot residue. Auzston explained that he swabbed the Cadillac's door handles and other surfaces on the passenger side of the car for DNA evidence. He also swabbed the passenger-side door panel for gunshot

residue. Although Auzston initially testified that he believed that he did not have test results regarding the gunshot residue because they had been delayed at the Texas Department of Public Safety ("DPS") lab, he later explained that, due to his oversight, the gunshot residue was not submitted to DPS for testing. And the gunshot residue swabs were still in the LMPD vault at the time he testified. Auzston noted that no matter what type of handgun had been used in the shooting at the complainant's shop, it was a firearm and a deadly weapon. Moreover, he explained that the gunshot residue test results would only reveal whether the gun had been fired from the car, not who had fired the gun.

Angelina Temple, a DPS forensic scientist, testified that she compared the known DNA sample taken from appellant to the DNA swabs taken from the green Cadillac. She explained that her analysis showed that appellant could not be excluded as a contributor of DNA to a majority of the swabs taken from the car, including the passenger-side door handle. Although the DNA of another individual was also present in the car, Temple's analysis excluded Thomas as a contributor of the DNA found on the steering wheel. Temple explained that because "touch DNA" evidence is "notoriously difficult to pin down," and because some people leave more DNA than others, the fact that Thomas' DNA was not found does not mean that he had not been in the car.

Galveston County Sheriff's Office Sergeant R. Paulk, who performed administrative work at the Galveston County Jail, testified that each inmate, when they are booked into the jail, receives a Telephone Identification Number ("TID") and is warned that all calls are monitored and recorded. During Paulk's testimony, the trial court admitted into evidence and the jury heard audio recordings of two telephone calls made from the jail with appellant's TID. In one of the telephone calls, the following conversation took place between appellant and an unidentified man:

| | |
|---|---|
| [APPELLANT]: | Hey, you ain't ever see [the complainant] since you've been out there? |
| [UNIDENTIFED MAN]: | Who? |
| [APPELLANT]: | [The complainant]. |
| [UNIDENTIFED MAN]: | Na'ah. |
| [APPELLANT]: | See that's who you need to get in touch with and see if [he] will sign an affidavit and drop the charges. Tell him we got something for him, we'll pay [him] a little something. |
| [UNIDENTIFIED MAN]: | For you too? |
| [APPELLANT]: | Huh? |
| [UNIDENTIFIED MAN]: | For you? |
| [APPELLANT]: | Yeah, 'cause he only, he ain't never said your name, you know what I'm |

8

|                      |                                                                                                                              |
| -------------------- | ---------------------------------------------------------------------------------------------------------------------------- |
|                      | saying?  He never, he said he don't know who was driving.                                                                     |
| [UNIDENTIFED MAN]:   | Yeah.                                                                                                                         |
| [APPELLANT]:         | So shit.  If he drop one, you know what I'm saying, if he not an active witness, if they don't have an active witness, they can't really, you know what I'm saying, proceed in they case. |
| [UNIDENTIFIED MAN]:  | Yeah.                                                                                                                         |

In the other telephone call, appellant spoke to an unidentified woman.  He told her, "Your boyfriend beat up on Markus Frank today," and he then identified Frank as "the [man] I shot at, your boyfriend beat him up."

### Sufficiency of the Evidence

In his fourth issue, appellant argues that the evidence is legally insufficient to support his convictions because "no rational jury" could have found him guilty of either offense "beyond a reasonable doubt."  Appellant asserts that a rational jury could not ignore evidence of "police misconduct and the effective suppression of evidence" and still find him guilty beyond a reasonable doubt.

We review the legal sufficiency of the evidence by considering all of the evidence "in the light most favorable to the prosecution" to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979).  Our role is that of a due process safeguard, ensuring only the

rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). However, our duty requires us "to ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

A person commits the offense of deadly conduct by discharge of a firearm "if he knowingly discharges a firearm at or in the direction of: (1) one or more individuals; or (2) a habitation, building, or vehicle and is reckless as to whether the habitation, building, or vehicle is occupied." TEX. PENAL CODE ANN. § 22.05(b) (Vernon 2011).

A person who has been convicted of a felony commits the offense of unlawful possession of a firearm if he possesses a firearm either: (1) after conviction and before the fifth anniversary of the end of his sentence; or (2) at any time thereafter from any location other than the premises at which he lives. *See* TEX. PENAL CODE ANN. § 46.04(a) (Vernon 2011).

Appellant first asserts that the record is "replete with compelling objective evidence" that requires reversal of his convictions. He points to Frank's testimony

that Thomas was driving the green Cadillac, which he asserts is contradicted by DPS forensic scientist Temple's testimony that the DNA testing did not identify Thomas' DNA in the green Cadillac. However, Temple also testified that because "touch DNA" evidence is "notoriously difficult to pin down" and some people leave more DNA than others, the fact that Thomas' DNA was not found in the car did not mean that he had not been in the car.

Appellant next asserts that "the only rational deduction to be drawn" from CSI Auzston's "failure to test" the gunshot residue and his alleged dishonesty was that "the State itself harbored reasonable doubt as to the guilt or innocence of [appellant] and did not want to undermine its quest for a guilty verdict." While Auzston did initially testify that he did not believe that the DPS lab had returned the results of the gunshot residue taken from the passenger-side door of the green Cadillac, he later corrected his prior statement and testified that, due to an oversight, he had not submitted the gunshot residue to DPS for analysis. Auzston explained that he had mistakenly believed that he had sent the gunshot residue to the DPS lab in Austin. Auzston's explanation is not unreasonable, and the jury did not have to conclude that he was dishonest or "the State itself harbored reasonable doubt" as to appellant's guilt.

Appellant further asserts that the complainant's testimony regarding appellant's attempted "bribe" of the complainant is not credible because of his use

11

of "'weasel' words, possibly to stay just north of a perjury charge." The jury heard evidence of appellant's attempted bribe not only from the complainant, but also from an audio recording of a telephone call that appellant made from the Galveston County Jail. During the telephone conversation, appellant implies that the man to whom he is speaking was the driver of the green Cadillac when he fired his gun at the complainant's shop and states that the complainant had not identified that man as the driver. Appellant suggests that the man find the complainant and offer to pay him money on appellant's behalf in exchange for signing an affidavit dropping his allegations.

More importantly, the jury found overwhelming evidence establishing appellant's guilt of the offenses for which he stood trial. The complainant testified that after he sent appellant away from his shop for fighting with Frank, appellant returned with a gun, looking for Frank. Although the complainant told appellant that Frank was gone, appellant insisted he was still at the shop, and when the complainant asked if he was going to "shoot [up his] shop while [his] little boy" was there, appellant replied, "Fuck you and your little boy." And he then began shooting his gun.

Frank and Thorne testified that Frank and appellant got into a fight, which the complainant broke up. Minutes after the complainant made appellant leave his shop, while Frank and Thorne were driving to Frank's home, they saw appellant

12

and another man driving appellant's green Cadillac back in the direction of the complainant's shop. While Frank was speaking with the complainant on the telephone, they heard arguing and gunshots.

The jury also saw the surveillance-camera videotape recording of appellant committing the offenses. The tape recording shows appellant's green Cadillac in front of the complainant's shop and an arm reaching out the passenger-side window pointing a gun toward the complainant's shop. The green Cadillac then drives away. Although the complainant cannot be seen on the tape recording, it shows the customer, who was holding the complainant's son at the time, run into the shop after the shots were fired.

The State also presented evidence that LMPD officers found "rounds," or spent bullets, at the complainant's shop. Officers found bullet holes in the shop's door, the side of the complainant's building, and in the taillight of a customer's car. The jury saw photographs of the bullet holes and the damage done by the bullet found in the car's taillight. CSI Auzston testified that no matter what type of handgun had been used in the shooting, it was a firearm and a deadly weapon.

Finally, the State produced evidence establishing appellant's prior felony conviction in 2011 for possession of a controlled substance.[3] The trial court

---

[3] *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115 (Vernon 2010). Appellant was convicted in *State of Texas v. Lawrence Reed*, No. 11CR0071 (56th District Court, Galveston County, Texas).

admitted into evidence the judgment, which showed that the instant offenses occurred before the fifth anniversary of his previous conviction. *See* TEX. PENAL CODE ANN. § 46.04(a)(1).

Jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given a witness's testimony. *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). And they may choose to believe or disbelieve any part of a witness's testimony. *See Davis v. State*, 177 S.W.3d 355, 358 (Tex. App.—Houston [1st Dist.] 2005, no pet.). "Likewise, 'reconciliation of conflicts in the evidence is within the exclusive province of the jury.'" *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000) (quoting *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986)).

As the fact finder, the jury was entitled to resolve conflicts in the testimony in favor of the complainant, and we defer to that resolution. *Williams*, 235 S.W.3d at 750. Viewing the evidence in the light most favorable to the jury's findings, we conclude that a rational trier of fact could have reasonably found that appellant discharged a firearm in the direction of one or more individuals or a building and was reckless with regard to whether the building was occupied. It also could have reasonably found that appellant possessed a firearm less than five years after the anniversary of the expiration of his sentence for a felony conviction. Accordingly, we hold that the evidence is legally sufficient to support his convictions.

We overrule appellant's fourth issue.

## Constitutional Challenge

In his first two issues, appellant argues that the trial court denied him due process of law because it allowed CSI Auzston to "offer[] false testimony" about the failure to test the gunshot residue taken from his car. *See* U.S. CONST. amend. XIV, § 1; TEX. CONST. art. 1, § 19. Appellant asserts that although Auzston testified that he did not believe that he had received gunshot residue test results back from the DPS lab, he had actually "concealed" the evidence. Appellant further asserts that the State failed to preserve, or it "suppressed" or "concealed," evidence that was "potentially exculpatory."[4] He complains that the State acted in bad faith by suborning "perjury," tampering with evidence, and not correcting "known false evidence."

In response, the State argues that appellant has not preserved this complaint for appellate review because he did not object to the State's failure to have the gunshot residue timely analyzed or tested. Appellant argues that no objection was required to preserve this error because it is a "non-waivable" error that constitutes "egregious harm," such that he did not receive a fair and impartial trial. *See Marin v. State*, 851 S.W.2d 275, 279 (Tex. Crim. App. 1993). And appellant asserts that the Texas Constitution provides "significantly greater protection than the federal

---

[4] Appellant acknowledges that "this case does not fit" the "mold" of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).

15

constitution in cases regarding the failure of the State to conduct tests on potentially exculpatory evidence."

Here, appellant did not challenge the State's failure to submit the gunshot residue for testing on any constitutional grounds, state or federal, during trial. Nor did appellant raise the argument to the trial court that the Texas Constitution provides greater protection than the Due Process Clause of the Fourteenth Amendment. To preserve error for appellate review, appellant was required to make a timely request, objection, or motion to the trial court stating the grounds for the ruling sought with sufficient specificity to make the trial court aware of his complaint. *See* TEX. R. APP. P. 33.1(a)(1); *see also Saldano v. State*, 70 S.W.3d 873, 887 (Tex. Crim. App. 2002) (stating that all but most fundamental rights may be forfeited if not objected to at trial). This is true even though the error of which appellant now complains on appeal concerns his constitutional rights. *Saldano*, 70 S.W.3d at 889; *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990). A defendant may waive his right to due process by failing to object at trial. *Briggs*, 789 S.W.2d at 924. Further, appellant was required to raise his argument in the trial court that the Texas Constitution provides greater protection than the Due Process Clause. *See Pena v. State*, 285 S.W.3d 459, 461, 464 (Tex. Crim. App. 2009) (concluding waiver of argument that Texas Constitution provides greater protection than Due Process Clause). We further note that appellant neither sought

16

a continuance, nor moved for testing of the gunshot residue. Accordingly, we hold that appellant has not preserved his complaint that the State's failure to test the gunshot residue violates his due process rights.

We overrule appellant's first and second issues.

## Admission of Evidence

In his third issue, appellant argues that the trial court erred in admitting into evidence the audio recordings of the two telephone calls that he made from the Galveston County Jail because the evidence suggested to the jury both "emotional and irrational" reasons to convict him, and the trial court failed to conduct the proper balancing test.[5] *See* TEX. R. EVID. 403.

We review a trial court's admission of evidence for an abuse of discretion. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). A trial court abuses its discretion if it acts arbitrarily or unreasonably, without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). When considering a trial court's decision to admit or exclude evidence, we will not reverse the trial court's ruling unless it falls outside the "'zone of

---

[5] Although appellant asserts that the trial court did not consider the appropriate factors when conducting the rule 403 balancing test, the record reveals that the trial court allowed appellant to articulate at length his objections to the audio recordings on the grounds of relevancy and rule 403. Appellant complained of the prejudicial nature of the two audio recordings separately, and the trial court ruled on the recordings separately. The trial court also allowed appellant ample opportunity to argue why he considered the audio recordings prejudicial and thus, should be excluded.

reasonable disagreement.'"  *Manning v. State*, 114 S.W.3d 922, 926 (Tex. Crim. App. 2003) (quoting *Montgomery*, 810 S.W.3d at 391).

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."  TEX. R. EVID. 403.  The opponent of the evidence must demonstrate that the negative attributes of the evidence substantially outweigh any probative value.  *Montgomery*, 810 S.W.2d at 377.  A rule 403 analysis requires a court to balance (1) the probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.  *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

The first factor focuses on "how strongly the evidence serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need" for the evidence.  *Id.* at 641; *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005).  The statements made during appellant's telephone conversations demonstrate that it is more probable that appellant was

involved in the shooting at the complainant's shop. During the first telephone call, appellant suggests that the unidentified man to whom he is speaking find the complainant and offer him money on appellant's behalf so that he will drop the allegations. Appellant discusses the unidentified man's role in the incident, and he points out that the complainant had only identified appellant as the shooter, but had not yet identified the man as the driver of the green Cadillac. This evidence corroborates the complainant's testimony that appellant attempted to bribe him to not testify at trial. During the second telephone call, appellant tells the woman that her "boyfriend beat up" Frank, who was the person appellant shot. Thus, the first factor weighs in favor of admissibility.

The second factor includes a consideration of "whether the proponent has other evidence establishing th[e] fact and whether th[e] fact is related to a disputed issue." *Mechler*, 153 S.W.3d at 441. The evidence presented to the jury by the telephone calls serves to corroborate the complainant's testimony that appellant was the shooter. The complainant was the only witness to specifically identify appellant as having the handgun and firing that weapon at him and the area around him. Although the State had the complainant's testimony, the recorded telephone conversations constituted the only direct admission by appellant that he "shot at" someone, thereby showing that he was in possession of the handgun. Thus, the second factor weighs in favor of admissibility.

The third factor, concerning undue prejudice, focuses on whether the evidence has the potential to impress the jury in some irrational but indelible way. *Id.* at 440. Rule 403 does not exclude all prejudicial evidence, only that which is "unfairly" prejudicial. *Id.* at 440–41. "Unfair prejudice" refers to the tendency of relevant evidence "to tempt the jury into finding guilt on grounds apart from proof of the offense charged." *Id.* at 440. The contents of appellant's telephone conversations are relevant and probative of whether he possessed a handgun and fired it at the complainant's shop. This evidence was not unfairly prejudicial because it directly relates to the offenses of which appellant stood accused. *See id.* at 440–41. Thus, the third factor weighs in favor of admissibility.

The fourth and fifth factors focus on the tendency of the evidence to confuse the jury, distract it from the main issues, or be given undue weight by the jury. Although the contents of the first telephone call arguably suggest that appellant was attempting to coordinate another crime by bribing a witness, both of appellant's telephone conversations directly concern the offenses of which appellant stood accused. This evidence could not have distracted the jury away from the instant offenses of unlawful possession of a firearm by a felon and deadly conduct.[6] In the first telephone conversation, appellant proposes an attempt to

---

[6] Although appellant was indicted for the offense of aggravated assault with a deadly weapon, the jury found him guilty of the lesser-included offense of deadly conduct.

"bribe" the complainant, the State's primary witness, to prevent him from testifying against appellant because he was the only "active witness." In the second telephone conversation, appellant admits that Frank had been assaulted and Frank was the man that appellant wanted to shoot. The complainant testified that appellant insisted that Frank was at the shop when appellant returned and fired his handgun at the complainant and his building. The fourth and fifth factors weigh in favor of admissibility.

Finally, the sixth factor concerns the efficiency of the trial court proceeding and focuses on whether the evidence resulted in undue delay or the presentation of cumulative evidence. *Gigliobianco*, 210 S.W.3d at 641. The State offered Sergeant Paulk's testimony concerning the unique TID given to Galveston County Jail inmates, and he identified the pertinent telephone calls as having been placed by appellant. Paulk further explained that jail inmates are warned that their telephone calls will be monitored and recorded, and his testimony comprises only nine pages of the reporter's record. The State played less than ten minutes of the audio recording of the first telephone call and only thirty-three seconds of the audio recording of the second telephone call. Thus, the sixth factor weighs in favor of admissibility.

The trial court could have reasonably concluded that the probative value of the contents of appellant's two telephone conversations placed from the Galveston

County Jail was not substantially outweighed by the countervailing factors specified in rule 403. We cannot conclude, given the deference we must apply in reviewing a trial court's rule 403 determination, that the trial court abused its discretion in admitting the pertinent portions of appellant's two telephone conversations. *See id.* at 642; *Mechler*, 153 S.W.3d at 442. Accordingly, we hold that the trial court did not err in admitting into evidence the complained of audio recordings of appellant's two telephone calls.

We overrule appellant's third issue.

## Conclusion

We affirm the judgment of the trial court.


                                        Terry Jennings
                                        Justice

Panel consists of Justices Jennings, Higley, and Sharp.

Do not publish. TEX. R. APP. P. 47.2(b).